### B. L. Fuller et al. v. Robert D. Samuels.

1. CONSPIRACY—*what evidence establishes fraudulent.* *Held,* that the evidence in this case did not establish duress but did establish the consummation of a fraudulent conspiracy.

2. PRINCIPAL AND AGENT—*when latter not authorized to cancel contract.* An agent authorized to negotiate a contract has no authority after its negotiation to consent to its cancellation.

Bill in equity. Appeal from the Circuit Court of DeWitt county; the Hon. SOLON PHILBRICK, Judge, presiding. Heard in this court at the November term, 1906. Affirmed. Opinion filed November 22, 1907.

EDWARD J. SWEENEY, for appellants.

INGHAM & INGHAM, for appellee.

MR. PRESIDING JUSTICE BAUME delivered the opinion of the court.

Appellee, Robert D. Samuels, filed his bill in equity against B. L. Fuller, F. T. DuBois, Northrup National Bank of Iola, Kansas, Sarah J. Samuels, appellants, and Mrs. F. T. DuBois and the Commercial Bank of Moweaqua, Illinois, to procure the cancellation of a certain written instrument, signed by appellee, directing the Northrup National Bank of Iola, Kansas, to collect a $2,000 certificate of deposit issued by the

Commercial Bank of Moweaqua, Illinois, to appellee, and which certificate of deposit had been delivered to appellant Fuller, by appellee, as part payment on a farm of 120 acres of land, situated near Iola, Kansas. The written instrument sought to be canceled, authorized the bank at Iola, Kansas, to collect said certificate of deposit from the bank at Moweaqua, Illinois, and to pay to appellant Fuller $600 and appellant Sarah J. Samuels, wife of appellee, $700 and to remit to appellee $700 and interest, if any.

The grounds alleged in the bill for the relief prayed are, that the said order of instructions to the Northrup National Bank was procured by the fraud, duress, collusion and conspiring of the appellants and one Jeter, and was without consideration. A general and special demurrer to the bill interposed by all of the defendants, except Mrs. F. T. Dubois and the Commercial Bank of Moweaqua, was overruled by the court, and thereafter the bill was dismissed as to said Mrs. F. T. DuBois and the Commercial Bank of Moweaqua. Thereupon appellants filed their several answers to the bill denying its material allegations, and also filed their cross-bill against appellee and the Commercial Bank of Moweaqua, praying that the court decree the said order of instructions to the Northrup National Bank to be valid, and direct the payment by it of the said certificate of deposit according to the terms of said order. The Commercial Bank of Moweaqua was defaulted for want of answer to the cross-bill and a decree *pro confesso* was entered against it. Appellee filed his answer denying the allegations of the cross-bill, and appellants replied to such answer, whereupon the cause, upon the original and cross-bills, was referred to the master in chancery to take and report the proofs together with his findings thereon. As to the original bill the findings of the master were against appellee and that said bill should be dismissed for want of equity and as to the cross-bill the master found that the complainants therein had a complete

remedy at law and recommended that the same be dismissed for want of equity. On the hearing before the chancellor upon the exceptions of the respective parties to the master's report, appellee's exceptions as to the findings upon the original bill were sustained and appellants' exceptions as to the findings upon the cross-bill were overruled and a decree was entered finding all the material allegations of the original bill to be true as therein stated, and directing that the order of instructions to the Northrup National Bank executed by appellee be set aside and canceled, and that said bank deliver to appellee the certificate of deposit for $2,000 issued to him by the Commercial Bank of Moweaqua. This appeal is prosecuted to reverse such decree.

In October, 1904, appellee and his wife, then residing in Clinton, Illinois, entered into a written contract whereby it was mutually agreed that each should live separate and apart from the other; that neither should bring suit against the other for separate maintenance or divorce; that the wife should have the sole custody and control of their two children, both of whom were then under age; that the wife should have the household furniture and the husband should convey to her eight lots in the city of Clinton; and that each should relinquish to the other all claim or interest in the property of the other after his or her death.

Appellee testifies that in April or May, 1905, he was solicited by appellant F. T. DuBois, a real estate agent residing in Clinton, to purchase a farm in Allen County, Kansas; that DuBois represented to him that he was acting as agent for Fuller & Jeter, real estate agents doing business in Kansas; that he told DuBois that he had no use for a farm, as he had no family to live with him; that thereupon DuBois told him that he (DuBois) had considerable influence with the wife of appellee and that he would go and see her and try to persuade her to consent to move to Kansas with the children and live with appellee on a farm; that

DuBois came to him later and told him that he (Du-Bois) had had an interview with appellee's wife and that she had signified her willingness to contribute the proceeds of the eight lots which she owned in Clinton toward the purchase of a farm in Kansas and take their children and live with appellee on the farm; that Jeter, who was then in Clinton, together with DuBois, looked at the eight lots in Clinton which were owned by appellee, and reported to him that they would take the lots at a valuation of $2,200, to apply upon the purchase price of a farm; that on May 15, 1905, appellee and his wife, DuBois and his wife and Jeter left Clinton for Iola, Kansas; that upon their arrival at Iola on May 17th, the party was met at the depot by Fuller, and appellee and his wife were entertained at the home of Fuller; that Fuller, Mr. and Mrs. DuBois, Jeter and appellee and his wife inspected some farms which Fuller had for sale; that he was favorably impressed with a farm containing 120 acres, which Fuller represented as belonging to a railroad man in Oklahoma, and was induced to agree to purchase the same at $50 an acre, $2,000 of the purchase money to be paid in cash and the balance on or before January 1, 1906, providing his wife would execute an agreement to sell her eight lots in Clinton and apply the proceeds to the deferred payment, and to destroy and nullify the existing contract between them relating to their living separate and apart; that on May 18th, Fuller drew up a contract for the sale of the farm to him; that he insisted that he should have until the following day to determine whether he would take the land, and that he understood such provision was incoporated in the contract; that Fuller insisted upon the payment to him of $2,000 and he was induced to deliver to Fuller a certificate of deposit on the Commercial Bank of Moweaqua for that amount; that on the night of May 18th, he was told by his wife that she did not think their son Clyde would be willing to come to Kansas to live and that if he did not come

she would not come either; that upon the following morning he told DuBois that the deal was off, and immediately wired the bank at Moweaqua not to cash the certificate of deposit; that thereafter he saw Fuller and notified him of his determination not to purchase the farm and requested him to cancel and destroy the contract which had been signed and to surrender the certificate of deposit; that Fuller demanded $500 as a consideration for the cancellation of the contract and surrender of the certificate; that he protested that Fuller's demand was exorbitant, but that he finally agreed to pay that amount in full settlement; that Fuller then said that $500 would only settle the amount due to himself and Jeter and that there were other parties to be consulted and settled with; that thereupon the wife of appellee demanded $700 as her share of the certificate and DuBois demanded $100 for his trouble; that he was thereby induced to sign the so-called "order of instructions," in controversy. It is not controverted that of the $600 directed to be paid to Fuller, $100 was to be paid by the latter to DuBois.

DuBois' version of his part in the transaction differs from that of appellee in that he testifies that appellee first suggested to him the purchase of a farm in Kansas and that he should attempt to bring about a reconciliation between appellee and his wife and induce her to take their children to Kansas and live with appellee on a farm. However, this may be, it is admitted by DuBois that he was the intermediary between appellee and his wife; that he induced appellee's wife to go to Kansas and paid her expenses on that trip.

W. E. Carrier, a witness called on behalf of appellee, testifies that in a conversation he had with Mrs. Samuels shortly prior to her departure for Kansas, she told him that her husband was going to buy a farm there; that she did not intend to live with him, as he anticipated she would, but as the laws of Kansas gave

Fuller v. Samuels.

a wife one-half of the real estate owned by the hus-
band it was to her advantage that he should make a
purchase, as she would thereby secure a greater in-
terest in his property. The witness George L. Sam-
uels testifies that he saw appellee's wife after her re-
turn from Kansas and that she told him of her trip;
that appellee had purchased a farm but had backed
out of the bargain; that she did not intend to have
anything to do with him, but went along to buy the
farm so she could have a better hold on his property.

Appellant Sarah J. Samuels testifies that her de-
mand upon appellee for $700 was based upon her claim
to one-half of the balance of the $2,000 certificate
after the payment to Fuller and DuBois of $600 and
also upon the fact that she had complied with her
agreement to live with appellee, "that she had lived
with him one night."

Fuller testifies that on the day following the exe-
cution of the contract of sale, appellee came to him
and offered him $100 if he would destroy the contract
and release appellee; that upon his refusal so to do
appellee increased the offer to $350; that he refused
to take that amount and demanded $500, which ap-
pellee finally agreed to pay; and that upon the sign-
ing of the order of instructions by appellee, he de-
stroyed the contract of sale and the instrument where-
by appellee's wife agreed to sell her eight lots in
Clinton and apply the proceeds upon the purchase
price of the farm, and to live with appellee.

There is no element of duress in the case, but we
are of the opinion that the evidence in the record
justifies the conclusion that the transaction in its en-
tirety was the consummation of a fraudulent conspir-
acy, at least upon the part of appellants Sarah J.
Samuels and F. T. DuBois to secure an unconscionable
advantage of appellee. Mrs. Samuels had no *bona fide*
intention to go to Kansas with her children and live
with appellee. Her assumed acquiescence in the under-
taking was a mere pretense and scheme to deceive

appellee, to the end that she might reap the advantage which would accrue to her from the purchase by appellee of land in Kansas. That appellant DuBois was fully informed of the intention and purpose of Mrs. Samuels we have no doubt.

Fuller testifies that he had no business relations with DuBois, yet, upon the arrival of the parties at Iola, he met them at the depot and took appellee and his wife to his home where all of the business was transacted, and where they remained during their stay in that town. The evidence does not disclose the source of Fuller's information that the parties were coming to Iola, but considering the object in view, the inference is not unreasonable that he obtained such information from either DuBois or Jeter. Certain it is that he did not meet the parties there casually or by mere chance, but, rather, that he was fully advised as to the time and object of their coming.

There is evidence tending to show that Fuller actively aided and assisted Mrs. Samuels and DuBois to obtain an unconscionable advantage of appellee. Not content with the agreement on the part of appellee to give him $500 for the privilege of rescinding the contract for the purchase of the land, he informed appellee that that amount would only settle his individual claim and that he (appellee) would have to settle with Mrs. Samuels and DuBois before the contract could be rescinded.

Fuller was the agent of the owner of the land for the purpose of effecting sale, and as such agent he negotiated with appellee for its sale, and entered into a contract with appellee whereby the latter bound himself to purchase the land. Upon the execution of the contract the authority of Fuller as agent to sell was accomplished and ceased, and he had no authority without the consent of his principal thereafter to cancel or rescind the contract so made. Luke v. Griggs, 4 Dak. 287; West End Hotel & Land Co. v. Crawford, 120 N. C. 347; Adrian v. Lane, 13 S. C. 183. The

agreement on the part of Fuller to cancel and rescind the contract for the sale of the land to appellee was beyond the scope of his authority as an agent to sell, and in the absence of consent or ratification by his principal, such agreement was unauthorized and void. The agreement to rescind the contract being unauthorized and void, could not operate as a consideration for the letter of instructions to the Commercial Bank of Moweaqua. As to Fuller, therefore, there was no valid and adequate consideration for such letter of instructions, and for the payment to him of the sum of money therein provided.

The decree of the court below is in consonance with equity and good conscience and will be affirmed.

*Affirmed.*